Kornel BOTOSAN, Plaintiff–Appellee,

v.

PAUL McNALLY REALTY, a California corporation; Chuck N. Ruston, Trustee of Trust U/D/T Dated Eleven October 1990; Judith A. Ruston, Trustee of Trust U/D/T Dated Eleven October 1990, Defendants–Appellants.

No. 99–55580.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1999

Filed June 20, 2000

Russell C. Handy, Law Offices of Mark D. Potter, San Diego, California, for the plaintiff-appellee.

Miriam R. Eisenstein, U.S. Department of Justice, Washington, DC, for amicus United States.

Before: BROWNING and TASHIMA, Circuit Judges, and KING,[1] District Judge.

KING, District Judge:

Plaintiff–Appellee Kornel Botosan ("Appellee") filed a private action against Defendants–Appellants Chuck and Judith Ruston (the "Rustons") and Paul McNally Realty, Inc., dba Realty World ("Realty World"; collectively, "Appellants"), alleging violations of the Americans With Disabilities Act ("ADA" or the "Act"), 42 U.S.C. § 12101 *et seq.*, and California's Unruh Civil Rights Act, Cal. Civ.Code § 51 *et seq.* Appellee claims he was denied access to Realty World's real estate office due to a lack of handicapped parking. Appellants argue, *inter alia*, that Appellee is not entitled to recovery because: (1) he did not provide notice of his ADA claim to a state or local agency charged with administering the relevant civil rights laws before filing suit; (2) McNally Realty assumed all liability for ADA compliance in its lease with the Rustons; (3) he did not prove actual damages; and (4) the ADA is an unconstitutional exercise of Congress' commerce power and unconstitutionally vague. The district court ruled in favor of Appellee on all arguments. We affirm.

Donald Merkin, Merkin & Associates, La Jolla, California, for the defendants-appellants.

1. Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

## I. BACKGROUND

Appellee is a paraplegic who requires the use of a wheelchair at all times. In December 1997, he visited Realty World, a real estate office, and discovered that the office did not provide handicapped parking. Due to the lack of a designated parking space for disabled persons, he was prevented from entering the office and becoming a customer. He made no other attempt to patronize Realty World after that single incident. On February 18, 1998, he filed a complaint alleging violations of the public accommodations provisions of the ADA (Title III), California's Health and Safety Code, the California Civil Code, and California's Unruh Civil Rights Act. Only the claims brought under the ADA and the Unruh Civil Rights Act are relevant for the purposes of the instant appeal. Appellee requested monetary damages, punitive damages, injunctive relief, and attorney's fees. He did not notify any state or local authorities about the violations he alleged in the complaint before filing suit.

The Rustons are trustees of the trust that owns the property on which Realty World is situated. Realty World leases the property from the Rustons. The lease contains several provisions that allocate responsibility for maintenance of the property and compliance with the law, as between the landlord and tenant.

Appellants filed a motion for summary judgment on May 1, 1998. Their motion raised two arguments: (1) that the Rustons were entitled to summary judgment as to all claims against them because the lease on the property assigned responsibility for compliance with all laws to the tenant; and (2) that both the Rustons and Realty World were entitled to summary judgment as to Appellee's claims for injunctive relief because the alleged violations had been remedied. In an order dated August 12, 1998, the district court denied the motion for summary judgment.

On September 2, 1998, Appellants filed a motion to dismiss arguing that Appellee failed to provide notice to a state or local agency charged with enforcing civil rights laws before filing suit pursuant to 42 U.S.C. § 2000a–3(c), thereby depriving the district court of subject matter jurisdiction. The district court denied this motion on November 24, 1998.

On December 23, 1998, Appellee filed a motion for summary judgment. Appellants' opposition to the motion argued, *inter alia*, that the ADA violated the Commerce Clause, was unconstitutionally vague, violated due process, and that Appellee had not proven actual damages. The district court granted Appellee's motion, awarded him $1,000 in damages, and issued a final order on February 19, 1999. Appellants timely appealed all of the district court's rulings.

## II. STANDARDS OF REVIEW

We review de novo a district court's grant or denial of summary judgment. *See Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998). The district court's order denying Appellants' motion to dismiss involved a determination of the existence of subject matter jurisdiction. We review that order de novo as well. *See Hexom v. Oregon Dep't of Transp.*, 177 F.3d 1134, 1135 (9th Cir.1999).

## III. DISCUSSION

The instant appeal presents four issues: (1) whether a plaintiff is required to notify the state or local agency charged with enforcing the applicable state civil rights laws at least 30 days prior to filing a private lawsuit under Title III of the ADA pursuant to 42 U.S.C. § 2000a–3(c); (2) whether a lease may allocate all responsibility for compliance with the ADA from the landlord to the tenant; (3) whether a plaintiff must prove actual damages under California's Unruh Civil Rights Act before awarding statutory minimum damages; (4) whether the ADA is an invalid exercise of the Commerce Clause power and unconsti-

tutionally vague. These are issues of first impression for this Court.

### A. *Notice Requirement under Title III*

■ Congress patterned Title III of the ADA ("Title III") after Title VII of the Civil Rights Act of 1964 ("Title VII"). Specifically, Title III provides that "[t]he remedies and procedures set forth in section 2000a–3(a) of [Title VII] are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability.…" 42 U.S.C. § 12188(a)(1). In turn, 42 U.S.C. § 2000a–3(a) provides that an aggrieved individual may bring "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order.…" 42 U.S.C. § 2000a–3(a). Appellants suggest that the remedies and procedures applicable to Title III and those applicable to Title VII are completely identical-that is, that suits brought under Title III are subject to all limitations imposed on suits maintained pursuant to Title VII. The limitation relevant in this case is found in § 2000a–3(c):

> [N]o civil action may be brought under subsection (a) of [§ 2000a–3] before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

42 U.S.C. § 2000a–3(c). The question before us is whether actions for violations of Title III are subject to this limitation. Section 12188(a)(1) of the ADA makes no explicit reference to § 2000a–3(c), thus leaving uncertain whether notice to an appropriate state or local agency is a prerequisite to filing suit under Title III.

A number of district courts have addressed the issue, with varying results. Some courts have held that the ADA implicitly incorporates the notice require-

ment of Title VII. *See, e.g., Burkhart v. Asean Shopping Ctr., Inc.,* 55 F.Supp.2d 1013 (D.Ariz.1999); *Snyder v. San Diego Flowers,* 21 F.Supp.2d 1207 (S.D.Cal.1998); *Mayes v. Allison,* 983 F.Supp. 923 (D.Nev. 1997); *Daigle v. Friendly Ice Cream Corp.,* 957 F.Supp. 8 (D.N.H.1997); *Howard v. Cherry Hills Cutters, Inc.,* 935 F.Supp. 1148 (D.Colo.1996). Others have held that no notice requirement applies to ADA Title III actions. *See, e.g., Guzman v. Denny's Inc.,* 40 F.Supp.2d 930 (S.D.Ohio 1999); *Moyer v. Showboat Casino Hotel, Atlantic City,* 56 F.Supp.2d 498 (D.N.J.1999); *Botosan v. Fitzhugh,* 13 F.Supp.2d 1047 (S.D.Cal.1998); *Lewis v. Aetna Life Ins. Co.,* 993 F.Supp. 382 (E.D.Va.1998); *Bercovitch v. Baldwin School,* 964 F.Supp. 597 (D.P.R.1997), *rev'd on other grounds,* 133 F.3d 141 (1st Cir. 1998); *Doukas v. Metropolitan Life Ins.,* No. Civ. 4–478–SD, 1997 WL 833134 (D.N.H. Oct.21, 1997); *Coalition of Montanans Concerned with Disabilities, Inc. v. Gallatin Airport Auth.,* 957 F.Supp. 1166 (D.Mon.1997); *Soignier v. American Bd. of Plastic Surgery,* No. 95C2736, 1996 WL 6553 (N.D.Ill. Jan.8, 1996), *aff'd,* 92 F.3d 547 (7th Cir.1996); *Grubbs v. Medical Facilities of Am., Inc.,* Civ. A. No. 94–0009–D, 1994 WL 791708 (W.D.Va. Sept.23, 1994). As a survey of the case law reveals, even district courts within this circuit are divided on the issue. No appellate court has yet addressed the issue directly. We now consider this issue of first impression.

■ Statutory interpretation begins with the plain meaning of the statute's language. *See United States v. Alvarez–Sanchez,* 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). Where the statutory language is clear and consistent with the statutory scheme at issue, the plain language of the statute is conclusive and the judicial inquiry is at an end. *See California Franchise Tax Bd. v. Jackson (In re Jackson),* 184 F.3d 1046, 1051 (9th Cir.1999).

The plain language of § 12188(a)(1) is clear and unambiguous, and it can be understood without reference to any other statutory provision. Section 12188(a)(1) is devoid of any reference to § 2000a–3(c). Yet, Congress explicitly incorporated subsection (a) of § 2000a–3 into § 12188(a)(1). The incorporation of one statutory provision to the exclusion of another must be presumed intentional under the statutory canon of *expressio unius*. Surely, "Congress obviously knew how to adopt provisions of Title VII because it expressly adopted subsection (a) ... [and it is] unlikely that Congress would absentmindedly forget to adopt a provision that appears a mere two paragraphs below the subsection it adopted." *Botosan*, 13 F.Supp.2d at 1050; *see also Guzman*, 40 F.Supp.2d 930. Even if incorporation of all subsections of § 2000a–3 into § 12188(a)(1) did not render the explicit reference to § 2000a–3(a) superfluous or redundant, the statute's legislative history, the Code of Federal Regulations, *see* 28 C.F.R. § 26.501(a), and the Department of Justice's Technical Assistance Manual generally support the conclusion that Title III actions do not require state notification. Thus, we hold that § 12188(a)(1) does not implicitly incorporate § 2000a–3(c). A plaintiff in a private Title III action is not required to provide notice to any state or local agency as a prerequisite to filing suit.

Accordingly, Appellee was not required to give notice to any state or local agency before filing his Title III action.

## B. *The ADA Landlord/Tenant Provisions*

The Rustons argue that they cannot be held liable to third parties for the ADA violations found on the property they leased to Realty World because the lease agreement shifted all responsibility for ADA compliance to Realty World. Allocation of liability between the landlord and the tenant, they contend, is permitted by ADA regulations.

Again, interpretation of a statute always begins with the statute's plain language. *See United States v. Alvarez–Sanchez*, 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). Subsection (a) of § 12182 provides that the ADA's prohibitions against discrimination apply to "any person who owns, leases (*or leases to* ), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). The express terms of the ADA hold a landlord liable for noncompliance. The legislative history of the ADA supports this construction of the statute:

> This [provision] makes it clear that the owner of the building which houses the public accommodation, as well as the owner or operator of the public accommodation itself, has obligations under this Act. For example, if an office building contains a doctor's office, both the owner of the building and the doctor's office are required to make readily achievable alterations. It simply makes no practical sense to require the individual public accommodation, a doctor's office for example, to make readily achievable changes to the public accommodation without requiring the owner to make readily achievable changes to the primary entrance to the building.

> Similarly, a doorman or guard to an office building containing public accommodations would be required, if requested, to show a person who is blind to the elevator or to write a note to a person who is deaf regarding the floor number of a particular office.

> The amendment also clarifies that entities which lease public accommodations are covered by the requirements of this title.

H.R.Rep. No. 101–485(III), at 55–56 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 478–79; *see also* H.R. Conf. Rep. No. 101–596, at 76, *reprinted in* 1990 U.S.C.C.A.N. 565, 585 (reporting that the Senate accedes to the House version).

■ Subsection (b) of § 12182 sets forth principles governing how § 12182 should be construed:

> It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, *or through contractual, licensing, or other arrangements,* to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

42 U.S.C. § 12182(b)(1)(A)(i) (emphasis added). The legislative history behind this provision explains:

> [T]he reference to contractual arrangements is to make clear that an entity may not do indirectly through contractual arrangements what it is prohibited from doing directly under this Act. ... [O]f course, a covered entity may not use a contractual provision to reduce any of its obligations under this Act. In sum, a public accommodation's obligations are not extended or changed in any manner by virtue of its lease with the other entity.

H.R.Rep. No. 101–485(II), at 104, *reprinted in* 1990 U.S.C.C.A.N. 303, 387. The legislative history confirms that a landlord has an independent obligation to comply with the ADA that may not be eliminated by contract. *See Independent Living Resources v. Oregon Arena Corp.,* 982 F.Supp. 698, 767 (D.Or.1997), *supplemented by,* 1 F.Supp.2d 1159 (D.Or.1998) (holding that the landlord, rather than the tenant, is responsible for ADA compliance in common areas).

■ Appellants correctly point out that regulations promulgated by the Department of Justice ("DOJ") permit a landlord and tenant to allocate responsibility for compliance in their lease. The regulation relevant to this topic provides:

> Both the landlord who owns the building that houses a place of public accommodation and the tenant who owns or operates the place of public accommodation are public accommodations subject to the requirements of this part. As between the parties, allocation of responsibility for complying with the obligations of this party may be determined by lease or other contract.

28 C.F.R. § 36.201(b). Significantly, the regulation states that a landlord is a "public accommodation," which triggers coverage under Title III. *See* § 12182(a). Furthermore, the regulation provides that allocation of responsibility between the landlord and a tenant by lease is effective only "[a]s between the parties." 28 C.F.R. § 36.201(b). Thus, contractual allocation of responsibility has no effect on the rights of third parties. *See Independent Living Resources,* 982 F.Supp. at 767. The power to waive or impose liability as against a third party resides only in Congress, and Congress has stated that both the landlord and tenant are liable under the Act.

This reading is supported by the DOJ's formal interpretation of the regulation in its Technical Assistance Manual:

> Both the landlord and the tenant are public accommodations and have full responsibility for complying with all ADA title III requirements applicable to that place of public accommodation. The title III regulation permits the landlord and the tenant to allocate responsibility, in the lease, for complying with particular provisions of the regulation. However, any allocation made in a lease or other contract is only effective as between the parties, and both landlord and tenant remain fully liable for compliance with all provisions of the ADA relating to that place of public accommodation.
>
> ILLUSTRATION: ABC Company leases space in a shopping center it owns to XYZ Boutique. In their lease, the parties have allocated to XYZ Boutique the responsibility for complying with the barrier removal requirements of title III within that store. In this situation, if XYZ Bou-

tique fails to remove barriers, both ABC Company (the landlord) and XYZ Boutique (the tenant), would be liable for violating the ADA and could be sued by an XYZ customer. Of course, in the lease, ABC could require XYZ to indemnify it against all losses caused by XYZ's failure to comply with its obligations under the lease, but again, such matters would be between the parties and would not affect their liability under the ADA. Department of Justice, Technical Assistance Manual on the American With Disabilities Act § III–1.2000 (1994). As this passage of the Technical Assistance Manual makes clear, the DOJ takes the view that a lease allocating liability between a landlord and a tenant does not affect either parties' liability with respect to third parties. We have held that "[t]he Justice Department's interpretation of its own regulations, such as the Technical Assistance Manual, must also be given substantial deference and will be disregarded only if 'plainly erroneous or inconsistent with the regulation.'" *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir.1999) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)). The DOJ's interpretation is entirely consistent with the regulation, and accordingly, it is due deference.

Finally, we take note of significant policy reasons for adhering to the DOJ's interpretation. Owners of public accommodations should not be permitted to contract away liability. In the proposed version of 28 C.F.R. § 36.201, the DOJ allocated responsibility for providing auxiliary aids and services solely to the tenant. *See* 28 C.F.R. ch. I, pt. 36, app. B., at 594. Groups representing persons with disabilities objected to the proposed rule because, in their view, it permitted a landlord to circumvent the ADA by leasing to smaller

entities for which ADA compliance would not be "readily achievable."[2] In response, the DOJ eliminated the provisions listing specific allocations to specific parties in the final rule, and instead, permitted the parties to allocate responsibility. *See id.*

Appellants' interpretation of the regulation would renew the concerns raised by the proposed rule. A landlord would be able to allocate all responsibility for ADA compliance to the tenant in the lease, and if the compliance measures were not "readily achievable" for the tenant, the plaintiff would have recourse against no one. Under the DOJ's interpretation of the regulation, however, the landlord is a necessary party in an ADA action, regardless of what the lease provides. The landlord can in turn seek indemnification from the tenant pursuant to their lease agreement. Not only does this construction of the regulation hamper efforts of a landlord and a tenant to evade ADA requirements, but it also aids in the enforcement of the Act. A landlord who is aware of its liability for any ADA violations found on its premises has a strong incentive to monitor compliance on its property. *See Independent Living Resources*, 982 F.Supp. at 768; *cf. Kim v. United States*, 121 F.3d 1269 (9th Cir.1997) (noting that making innocent store owners responsible for misconduct by store's employees as to Food Stamp program created incentive for employers to monitor employees' compliance with program regulations).

We hold that the lease agreement between the Rustons and Realty World did not transfer all liability for ADA compliance to the lessee.

C. *Damages Under the Unruh Civil Rights Act*

■ The district court held that Appellee could recover damages under Califor-

---

2. The economic situation of a public accommodation owner is taken into account in assessing whether the removal of architectural barriers or the provision of auxiliary aids is

"readily achievable." *See* 42 U.S.C. § 12181(9). For the statutory language listing the factors relevant to this determination, see *infra* Part III(D).

nia's Unruh Civil Rights Act[3] without proving that it was impossible for him to enter Realty World. Instead, Appellee only had to prove he was denied "equal access." The court awarded Appellee statutory minimum damages of $1,000. Appellant argues that the district court erred in awarding damages in the absence of proof of actual damages.

 Section 52(a) of the Unruh Civil Rights Act states:

Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 or 51.5, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than one thousand dollars ($1,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51 or 51.5.

Cal. Civ.Code § 52. The statute lists actual damages and statutory damages as two separate categories of damages that a plaintiff may recover. Therefore, proof of actual damages is not a prerequisite to recovery of statutory minimum damages.

This interpretation of section 52 is consistent with the California Supreme Court's holding in *Koire v. Metro Car Wash*, 40 Cal.3d 24, 219 Cal.Rptr. 133, 707 P.2d 195 (1985). In that case, the plaintiff sued under the Unruh Civil Rights Act to challenge the policies of two business establishments that gave discounted prices only to females. Although the plaintiff, a male, could not prove any actual damages, the court held that "the statute provides for damages aside from any actual damages incurred by the plaintiff." *Id.* at 200.

Later cases have clarified the rule established in *Koire*. In *Donald v. Cafe Royale, Inc.*, 218 Cal.App.3d 168, 266 Cal.Rptr. 804

(1990), the California Court of Appeal held that in order to maintain an action for damages under the Unruh Civil Rights Act, "an individual must take the additional step of establishing that he or she was denied equal access on a particular occasion." *Id.* at 813; *see also Boemio v. Love's Restaurant*, 954 F.Supp. 204, 207 (S.D.Cal.1997). However, proof of denial of access can be indirect. In *Arnold v. United Artists Theatre Circuit, Inc.*, 866 F.Supp. 433 (N.D.Cal.1994), the court held that a plaintiff can recover damages where there is proof that violations of applicable California disability standards deterred him or her on a particular occasion from attempting to enter a place of public accommodation. *See id.* at 439.

In this case, Appellee has established a case for an award of statutory minimum damages. The record is undisputed that Appellants did not provide handicapped parking on at least one occasion when Appellee attempted to become a customer. At the least, these facts make out a case of deterrence. As the district court noted, although Appellee could have gained access to Realty World by using a non-disabled parking space, he would have risked having another car park next to him, thereby making it impossible for him to reenter his vehicle from his wheelchair. Appellee was thus deterred from patronizing Realty World. The district court was correct in awarding him statutory minimum damages.

### D. Constitutionality of the ADA

 Appellants attack the constitutionality of the ADA on the basis that (1) it is an invalid exercise of congressional power under the Commerce Clause, and (2) it is unconstitutionally vague.

We need not decide whether Congress properly invoked its Commerce Clause power in enacting the ADA, for we have already held that the ADA is a valid exer-

---

3. Sections 51 and 54 of the Unruh Civil Rights Act prohibit discrimination against persons with disabilities. *See* Cal. Civ.Code §§ 51, 54.

cise of congressional power under section 5 of the Fourteenth Amendment. *See Clark v. California,* 123 F.3d 1267 (9th Cir.1997), *cert. denied sub nom., Wilson v. Armstrong,* 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *see also Amos v. Maryland Dep't of Public Safety & Correctional Servs.,* 178 F.3d 212, 223 (4th Cir. 1999) (finding it unnecessary to decide the constitutionality of the ADA under the Commerce Clause because it had determined that the ADA was a valid exercise of congressional power under the Fourteenth Amendment).

■■■ Appellants' suggestion of vagueness is similarly without merit. Because the ADA is a statute that regulates commercial conduct, it is reviewed under a less stringent standard of specificity. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Nunez v. City of San Diego,* 114 F.3d 935, 940 (9th Cir.1997).

■■■ The fundamental rationale underlying the vagueness doctrine is that due process requires a statute to give adequate notice of its scope. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). A statute is vague not when it prohibits conduct according "to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). Under this standard, the ADA would be vague only if it is so indefinite in its terms that it fails to articulate comprehensible standards to which a person's conduct must conform.

Appellants' vagueness challenge essentially attacks the definitions of two terms in Title III:(1) "readily achievable" and (2) "disability."

■■■ The term "readily achievable" is defined as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). The ADA lists four factors for determining whether an action is readily achievable:

(A) the nature and cost of the action needed under this chapter;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

*Id.*

Although the definition of "readily achievable" and its corresponding factors are no models of precision, they do not qualify as vague. *See Pinnock v. International House of Pancakes Franchisee,* 844 F.Supp. 574, 581–82 (S.D.Cal.1993) (holding that the term "readily achievable" is not vague). Taken together with administrative regulations and interpretations, the term, as it is used in Title III, is sufficiently specific to put the owner of a public accommodation on notice of what is required by Title III. *See United States v. Schneiderman,* 968 F.2d 1564, 1568, *cert. denied,* 507 U.S. 921, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993) (explaining that administrative regulations and interpretations may provide sufficient clarification to save an otherwise vague statute). In an appendix to the ADA regulations, the DOJ has printed a handbook entitled "ADA Accessibility Guidelines for Buildings and Facilities." *See* 28 C.F.R. ch. 1, app. A. The handbook contains numerous diagrams and

specifications explaining the type of modifications and auxiliary aids (e.g., handrails, grab bars, ramps) that a building must install to be ADA compliant. With documentation of this specificity available, the standard of what is "readily achievable" can hardly be considered vague.

 Likewise, the term "disability" is not unconstitutionally vague. Appellants contend that, because the ADA covers numerous disabilities, a business owner cannot know which of all possible disabilities it must accommodate. Rather than listing all the disabilities covered, the ADA provides that a "disability" is a condition that fits into one or more of these categories: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Congress chose not to give an exhaustive enumeration of impairments or disabling conditions because of the difficulty of compiling such a list and because new disorders would undoubtedly develop in the future. *See* H.R.Rep. No. 101–485(III), at 27, *reprinted in* 1990 U.S.C.C.A.N. 445, 449. However, ADA regulations give specific examples of what constitute "physical or mental impairment" and "major life activities." *See* 28 C.F.R. § 36.104. The regulations also list what is not considered a disability. *See id.* Given the broadness of the concept of a "disability," Congress and the DOJ have done an adequate job of making the ADA's requirements cognizable yet flexible.

## IV. *CONCLUSION*

For the foregoing reasons, the district court's denial of Appellants' motion to dismiss, denial of Appellants' motion for summary judgment, and granting of Appellee's motion for summary judgment are AFFIRMED.