OPINION
WARDLAW, Circuit Judge.
Paul Werner Tobeler appeals his convictions for interstate transportation of stolen motor vehicles, engagement in monetary transactions involving the proceeds of the sale of those vehicles, and conspiracy to commit those crimes. We must decide whether the definition of “motor vehicle” in the Dyer Act, 18 U.S.C. §§ 2311, 2312, encompasses the backhoes, loaders, graders, trenchers, and scrapers Tobeler was convicted of stealing, transporting, and reselling. Because we conclude that such construction equipment falls within the definition of “motor vehicle” contained in the Act, we affirm Tobeler’s convictions.
I. Background
Tobeler was charged with thirty counts of transporting stolen motor vehicles in interstate commerce, in violation of the Dyer Act, 18 U.S.C. § 2312; eleven counts of engaging in monetary transactions with the proceeds derived from those stolen vehicles in violation of 18 U.S.C. § 1957; and conspiracy to commit those crimes in violation of 18 U.S.C. §§ 371 and 1956(h).
At trial, the government presented evidence that Tobeler contracted under false names with auction houses operating throughout the country to consign stolen construction equipment for auction. While conducting this equipment consignment business, Tobeler had purportedly been operating several equipment rental businesses throughout the Los Angeles area. The evidence showed, however, that Tobeler had been receiving vehicles stolen from both City of Los Angeles and private construction sites throughout the Southern California area. Tobeler himself was observed driving equipment away from construction site lots.
In preparation for the construction equipment’s later sale at auction, Tobeler and his employees altered the Product Identification Number (“PIN”) that identified each vehicle. They substituted new PIN plates for the actual plates and sanded down PIN numbers embossed on the vehicles so they could re-stamp new, false numbers. Tobeler also had employees repaint and remove decals from the stolen vehicles. Tobeler would then contact various auction houses under the false names *1203 of “Paul La Palma,” “Dale La Palma,” and “Tom Thomas” to consign the stolen vehicles for sale at auction. After selling the vehicles, the auction houses would remit checks to one of Tobeler’s rental businesses, and Tobeler would deposit the checks into the business bank accounts.
The stolen equipment that Tobeler consigned included backhoes, loaders, graders, trenchers, and scrapers.[1] Each piece of equipment had tires, a motor, and a driver’s seat. Each, while designed for construction purposes, was capable of self-propelled motor transport.
A jury convicted Tobeler of all charges. The district court entered a judgment and commitment order on November 6, 2000, sentencing Tobeler to 78 months incarceration. We have jurisdiction over Tobeler’s timely appeal pursuant to 28 U.S.C. § 1291.
II. Discussion
The validity of each of Tobeler’s counts of conviction depends upon whether the construction equipment in which he commerced can be construed as a “motor vehicle” under the Dyer Act. If the stolen construction vehicles that Tobeler consigned for auction and from which he ultimately profited do not constitute “motor vehicles” under 18 U.S.C. § 2311, Tobeler could not properly have been convicted of interstate transport of motor vehicles. Nor could he be convicted of engaging in monetary transactions involving proceeds from such vehicles or conspiracy to commit the above crimes. Because, however, we conclude that the definition of “motor vehicle” under 18 U.S.C. § 2311 encompasses the construction equipment at issue, we affirm his convictions on all counts.
Examining the plain language of the Dyer Act, its legislative purpose, and persuasive authority from other circuits,' we are compelled to conclude that' the Dyer Act’s definition of “motor vehicle” encompasses the construction equipment underlying Tobeler’s convictions.
Section 2311 of the Dyer Act defines “motor vehicle” as “an automobile, automobile truck, automobile wagon, motorcycle, or any other self-propelled vehicle designed for running on land but not on rails.” 18 U.S.C. § 2311. The process of interpreting this section “begins with the plain meaning of the statute’s language.” Botosan v. Paul McNally Realty, 216 F.3d 827, 831 (9th Cir.2000). We have long held that “there is a strong presumption that the plain language of [a] statute expresses congressional intent, rebutted only in rare and exceptional circumstances, when a contrary legislative intent is clearly expressed.” Middle Mountain Land & Produce, Inc. v. Sound Commodities Inc., 307 F.3d 1220, 1223 (9th Cir.2002).
Each of the construction vehicles stolen, transported, and sold by Tobeler was self-propelled and “designed for running on land but not on rails.” Each was equipped with motors, tires, and driver’s seats, much like cars or trucks. These construction vehicles thus meet all of the requirements for a motor vehicle imposed by the plain language of § 2311.
*1204 Tobeler argues that the Supreme Court’s decision in McBoyle v. United States, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816 (1931), indicates that we should read “motor vehicle” narrowly as referring only to those motor vehicles used primarily for motor transport. But that is not at all what McBoyle stands for. At issue in McBoyle was whether the interstate transportation of a stolen airplane was prohibited by the version of the Dyer Act then in effect. Id. at 26, 51 S.Ct. 340. At the time, a “motor vehicle” under the statute included “an automobile, automobile truck, automobile wagon, motorcycle, or any other self-propelled vehicle not designed for running on rails.” Id. Justice Holmes, writing for the Court, crisply dispensed with the government’s attempt to enlarge the statute over its plain reading, reasoning that “in every day speech ‘vehicle’ calls up the picture of a thing moving on land.” Id. The Court concluded that “a vehicle running on land is the theme” of the Act, especially when Congress had specifically listed “automobile, automobile truck, automobile wagon, [and] motorcycle” as examples of motor vehicles. Id. The statute was thus intended to cover only vehicles that run, and not “a vehicle, that flies,” such as an airplane. Id. at 27, 51 S.Ct. 340. In the context of discussing whether the statute provided fair warning to a criminal that interstate transport of stolen aircraft was prohibited, the Court concluded it did not because the rule of conduct was “laid down in words that evoke in the common mind only the picture of vehicles moving on land.” Id. at 27, 51 S.Ct. 340. Thus, McBoyle is ultimately unhelpful to Tobeler, as the construction vehicles here fall within the “picture of vehicles moving on land.”
Moreover, the purpose underlying the enactment of the Dyer Act would be undermined by a contrary finding. As the Supreme Court has noted, the advent of the automobile created a new problem for law enforcement in individual states. United States v. Turley, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). Automobiles were particularly susceptible to theft and immediate transportation across state lines because they were “valuable, salable article[s] which [themselves] provided the means for speedy escape. The automobile became the perfect chattel for modern large-scale theft.” Id. at 413, 77 S.Ct. 397 (internal quotation omitted).
Construction vehicles like those stolen, transported, and sold by Tobeler present the identical law enforcement obstacle. They are valuable, salable, and, as testimony describing Tobeler driving away from a construction site in such a vehicle indicates, provide their own means of escape.[2] Theft of farm and construction equipment is widespread, costing billions of dollars annually. California Highway Patrol Safety Service, Farm and Construction Equipment Theft Prevention, available at http:// www.chp.ca.gov/html/ farmconstruction.html. The National Insurance Crime Bureau notes that out of all the construction equipment on site, “[r]ubber tire equipment is most likely to be stolen because it can be driven away under its own power ....” National Insurance Crime Bureau, Thieves Eye Heavy Equipment, available at http:// www.nicb.org/pdi/thieves_heavy_equip.pdf.
Tobeler further contends that the Dyer Act was aimed at vehicles used for transportation alone, noting that Senator Dyer’s report to Congress advocating passage of the statute addressed only cars. H.R. Rep. 312, 66th Cong. (1st Sess.1919). *1205 It is well-settled, however, that the criminal acts defined by a statute reach beyond the precise act for which the statute is designed:
[I]t is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy — even assuming that it is possible to identify that evil from something other than the text of the statute itself.... [This court has] acknowledge^] the reality that the reach of a statute often exceeds the precise evil to be eliminated.
Brogan v. United States, 522 U.S. 398, 403, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998). Furthermore, although “criminal statutes are to be construed strictly ... this does not mean that every criminal statute must be given the narrowest possible meaning ....” Turley, 352 U.S. at 413, 77 S.Ct. 397. While there may be no language in the congressional reports to suggest that Congress considered whether the theft of construction vehicles in particular should be covered by the Dyer Act, the statutory language is certainly broad enough to encompass such vehicles, and such a reading furthers, not hinders, the statutory purpose.
The Fifth and Eighth Circuits are in accord with this view. In United States v. McGlamory, 441 F.2d 130 (5th Cir.1971), the Fifth Circuit held that “motor vehicle” is a descriptive, generic term broad enough to encompass a bulldozer. Id. at 133. The Fifth Circuit declined to adopt the suggestion made here — that the Act concerned only vehicles used solely for transportation. It found no requirement that a vehicle must be used for transportation of passengers or that it must operate on highways. Id. The Eighth Circuit expressly agreed in United States v. Straughan, 453 F.2d 422 (8th Cir.1972), using the same analysis to determine that a farming tractor was a “motor vehicle” under the Dyer Act. Id. at 424.
Nevertheless, clinging to the portion of the McBoyle Court’s rationale finding that the items specifically listed in the Act were of a nature that excluded things that fly, Tobeler argues that the rule of ejusdem generis requires us to limit the definition of “motor vehicle” to only those vehicles used primarily for transportation. “Under the rule of ejusdem generis, where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated.” Harrison v. PPG Indus., 446 U.S. 578, 588, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980). It is true here that the clause listing specific vehicles — “automobile, automobile truck, automobile wagon, and motorcycle” — precedes the more general clause — “any other self-propelled vehicle designed for running on land but not on rails.”' Based on this statutory structure, Tobeler reasons that because the specific list of vehicles itemizes only motor vehicles used primarily for motor transport, we must read into the general clause the same limitation. Thus, the defining phrase “any other self-propelled vehicle designed for running on land but not on rails” would exclude vehicles used primarily for construction.
The rule of ejusdem generis, however, is merely a tool for statutory construction. This tool was useful for the McBoyle Court, because Congress had not yet made it clear that it intended the Dyer Act to encompass vehicles “designed for running on land.” The Court was thus left to construe Congress’s intent by considering its exclusion of “vehicles- not designed for running on rails.” (Emphasis added). The tool of ejusdem generis is less helpful here, because Congress later made it clear that “motor vehicle” referred to any vehicle running on land. Moreover, when Congress clarified the definition of motor vehicle, it simultaneously and purposefully *1206 broadened the ambit of the statute by amending § 2312 to criminalize interstate transportation of both stolen motor vehicles and aircraft.
The tool of ejusdem generis has never been deemed dispositive, especially in the presence of other indicia of legislative meaning or purpose:
[I]t is ... only an aid to the ascertainment of the true meaning of a statute ... [and] is neither final nor exclusive .... If, upon a consideration of the context and the objects sought to be attained and of the act as a whole, it adequately appears that the general words were not used in the restricted sense suggested by the rule, we must give effect to the conclusion afforded by the wider view in order that the will of the Legislature shall not fail.
Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 89, 55 S.Ct. 50, 79 L.Ed. 211 (1934).
When a statute’s plain meaning is apparent, there is no need to resort to the rule of ejusdem generis, particularly when its application leads to a result undermining the statutory purpose. In Harrison v. PPG Industries, 446 U.S. 578, 588-89, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980), for example, the Supreme Court refused to apply the rule of ejusdem generis to the Clean Air Act’s expansive “any other final action” clause. The Court noted that Congress had amended the statute in question to add “not simply ‘other final action,’ but rather ‘any other final action,’ ” and held that “[t]his expansive language offers no indication whatever that Congress intended the limiting construction” urged under the rule of ejusdem generis. Id. at 589, 100 S.Ct. 1889. Similarly, here, the general clause of § 2311 refers to “any other self-propelled vehicles _” 18 U.S.C. § 2311 (emphasis added).
We also rejected the narrow statutory interpretation suggested by ejusdem gen-eris to embrace a broader statutory reading in United States v. Baird, 85 F.3d 450 (9th Cir.1996), where we were called upon to determine whether the Civil Rights Act of 1964’s definition of “place of entertainment” encompassed a 7-11 store containing two video games. Despite the appel-lee’s contention that, pursuant to ejusdem generis, “any other place of exhibition or entertainment” should be limited to places like those specifically listed in the statute — “motion picture house, theater, concert hall, sports arena, [and] stadium” — we embraced a more literal definition of the general clause so as to reach the “evil addressed by the statute ....“ Id. at 452-53.
III. Conclusion
Tobeler’s reliance on the rule of ejusdem generis fails in light of the Dyer Act’s plain language and purpose. We hold that the definition set forth in the Dyer Act is sufficiently broad to encompass vehicles that run on land, even if they have the additional purpose of construction.
AFFIRMED.

. Tobeler generally references this equipment as construction and earth-moving equipment. He specifically defines only "trenchers” as "machinéis] designed to dig.” Law enforcement officials testified that wheel loaders “are earth-moving machines, similar to bulldozers, except ... with large rubber tires instead of the tracks found on bulldozers," and motor graders "are used to level roads and lay foundation for roads.” According to Webster’s New Collegiate Dictionary, 150th edition, a backhoe is "an excavating machine whose bucket is rigidly «attached to a hinged stick ... and is drawn toward the machine in operation” and a scraper is a device that "removes (excrescent matter) from a surface by usually repeated strokes of an edged instrument.”

. The record indicates only that Tobeler was observed driving away from a construction site; no reference as to speed or the lack thereof was made, but it is clear from the evidence that he or his colleagues drove off in the very vehicles they were stealing.